

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                   )
                                     )
    Plaintiff-Respondent,    )
                                     )
vs.                                  )          No. SD38111
                                     )
KEYMOND S. BROWN,                    )          **Filed:  December 19, 2024**
                                     )
    Defendant-Appellant.     )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable David C. Jones, Judge

**<u>AFFIRMED</u>**

Keymond S. Brown ("Brown") appeals the judgment of the Circuit Court of Greene

County ("trial court") convicting him of murder in the second degree, unlawful use of a weapon,

and two counts of felony armed criminal action following a jury trial.  *See* sections 565.021,

571.030, and 571.015.[1]  After Brown waived his right to jury sentencing, the trial court

sentenced him to 18 years' imprisonment for murder in the second degree, 15 years'

---

[1] All references to section 565.021 are to RSMo 2016, including changes effective January 1, 2017; all references to section 571.030 are to RSMo Cum. Supp. 2021, including changes effective August 28, 2021; and all references to section 571.015 are to RSMo Cum. Supp. 2020, including changes effective August 28, 2020.

imprisonment for unlawful use of a weapon, and three years' imprisonment for each felony armed criminal action count, with the sentences for murder in the second degree and unlawful use of a weapon to be served concurrently to each other but consecutively to the armed criminal action counts, which were to be served concurrently to each other, for a total of 21 years' imprisonment. Brown presents two points on appeal. In Point I, Brown claims the trial court abused its discretion in overruling his motion to compel discovery and failing to compel disclosure of J.F.'s ("Victim's") juvenile records. In Point II, Brown claims the trial court abused its discretion in admitting evidence obtained from Brown while in juvenile detention. Finding no merit in either point, the trial court's judgment is affirmed.

### Factual Background and Procedural History

On July 30, 2022, a shootout involving multiple people occurred at the White Oak gas station (referred to herein as "White Oak") on South Scenic Avenue in Springfield, Missouri. Approximately 50 gunshots were fired during the shooting spree. Victim was shot and, shortly thereafter, died as a result of his gunshot wound.

On the date of the incident, at approximately 2:40 a.m., Springfield Police Officer Isaiah Houseknecht was on patrol in the area of Scenic Avenue and Walnut Street. As Officer Houseknecht was driving by White Oak on his way to another call, he noticed a number of cars and a large group of people gathered there, even though White Oak was closed at that time of the morning. After driving by White Oak, Officer Houseknecht proceeded to the location of his call, and then turned around and headed back north toward White Oak. As he was approaching Walnut Street on Scenic Avenue, he heard multiple gunshots and observed a vehicle pulling out of White Oak's parking lot at a high rate of speed, with "somebody hanging out of the passenger side window, leaning over the hood of the car," firing a handgun toward White Oak. Officer

2

Houseknecht dispatched a Code 3, the highest level of call he could make, asking for all Springfield Police and Greene County officers in the area to respond. Officer Houseknecht turned on his emergency lights and attempted to turn around to follow the vehicle that left White Oak. While he was attempting to turn around, his patrol vehicle was almost struck by another vehicle, a dark-colored Dodge Charger, leaving the White Oak parking lot at a high rate of speed and fishtailing. The officer turned around again and followed the Dodge Charger northbound on Scenic Avenue, turning onto College Street and then onto Chestnut Expressway. The Dodge Charger refused to stop, lost control on Chestnut Expressway, crossed a median and continued westbound on Chestnut Expressway. Officer Houseknecht ended his pursuit of the vehicle at that time because he knew the Dodge Charger was not going to stop for his lights, and returned to White Oak to see what evidence was left there at the scene. When he arrived at White Oak, only one vehicle was still there. A large number of spent shell casings were found at White Oak and down Scenic Avenue.

Around that same time, Springfield Police Officer Joel Henry received the Code 3 call on his police radio and proceeded to the White Oak area but was diverted by a call from Springfield Police Officer Shelby Chaney to a location by Cricket Wireless on West Chestnut Expressway. Officer Chaney was "out at a vehicle." The vehicle was the Dodge Charger, which had eventually come to a stop at the 2800 block of Chestnut Expressway, not far from White Oak. When Officer Henry arrived, Officer Chaney was standing next to her police vehicle and the Dodge Charger was parked approximately two car lengths in front of her vehicle. Another person was standing outside of the Dodge Charger, and the officers directed him to walk back toward them. That individual made statements that his friend in the backseat of the Dodge Charger needed medical help. As other officers arrived on scene, Officer Henry walked toward

the Dodge Charger and saw Victim in the rear passenger seat positioned face-down toward the rear of the driver's seat. Victim suffered a gunshot wound to his head. Victim appeared to be in critical state; Victim was unconscious, bleeding significantly with heavy and labored breathing. Victim was treated at the scene and then transported by paramedics to the hospital where he later died.

Security footage from White Oak recorded the first gunshot fired from a Volkswagen Jetta. Brown was a passenger in the Jetta. Video footage also recorded Brown walking up to the Dodge Charger and firing his gun into the vehicle.

Brown was arrested two days after the shooting when Brown's girlfriend's vehicle was pulled over for a traffic stop. Brown was the front passenger in the vehicle and told his girlfriend to "keep going" but she eventually stopped for the police. A Glock 26 9-millimeter pistol was found in the vehicle. Four cartridge casings, three found near where Brown was shooting into the Dodge Charger and one found on the front passenger floorboard of the Dodge Charger, were determined to have been fired by the Glock pistol found in girlfriend's vehicle.

Brown was charged by Amended Felony Information with murder in the second degree, unlawful use of a weapon, and two counts of armed criminal action and proceeded to a jury trial on May 1, 2023.[2] At trial, D.H., Brown's friend, testified a "heated discussion" occurred between himself and Victim and they pushed each other. D.H. was right in front of Victim talking to him as Victim backed up. Victim tried to pull his gun out of his waistband, but did not get it out. D.H. pulled his gun out and pointed it at Victim, put his left hand out, and told Victim to stop. Others at White Oak pointed guns at each other too. Victim then tripped over the curb and said he did not want any problems. When a police car went by, Victim and others in his

---

[2] Trial was held May 1-5, 2023.

group got in the Dodge Charger. D.H. further testified that "[e]verybody was getting ready to leave" and that the argument was "starting to die down." D.H. went to the Dodge Charger and tried to hold the rear passenger door as Victim tried to close it, but Victim closed the door. While D.H. was standing next to the rear passenger side of the Dodge Charger, Brown came right next to him on his left. D.H. testified that when he looked in the Dodge Charger, everyone, including Victim, had their gun lying on their laps. No one was pointing a gun or arguing at that time. M.M., who was in the Dodge Charger seated behind the driver's seat, testified Victim was not talking and had his hands up. D.H. testified he looked out toward the street for the police car, and one or two seconds after looking away, he heard gunshots. He immediately looked back and saw Brown shooting into the Dodge Charger.

D.H.'s sister, T.H., testified at trial she saw Brown shooting into the Dodge Charger and she did not hear any other gunshots before that. Surveillance video from White Oak admitted as an exhibit at trial showed that Brown kept firing while he moved backward. T.H. further testified that after Brown started firing, there were "a lot" of gunshots.

Brown testified on his own behalf at trial. Brown stated he fired his gun at Victim "[f]or protection in self-defense." Brown stated that Victim pointed a gun in his direction and Brown was "scared for [his] life." Brown testified that he shot into the Charger at least four times at Victim. Brown was a few feet away from the Charger at the time he fired his gun. Four shell casings from Brown's gun were found at White Oak.

Brown's girlfriend testified that she and Brown went to Chicago for a spontaneous shopping trip the day after the shooting at Brown's suggestion and returned shortly thereafter. Brown told her not to say anything about the shopping trip because it would "get [her] in trouble." She testified she repeatedly asked Brown about the shooting, but that Brown never

5

provided a response and that he would not look at her. Brown admitted the gun found in his girlfriend's car was the same gun he had at the shootout. The jury found Brown guilty of the charged offenses and the trial court sentenced Brown to a total of 21 years' imprisonment. This timely appeal follows.

**Point I**

In his first point, Brown contends the trial court abused its discretion in overruling his Motion to Compel Juvenile Records and failing to order the disclosure of Victim's juvenile records because there was a reasonable likelihood Victim's records would have led to material and admissible evidence that Brown acted in self-defense.

Because the juvenile division of the circuit court of Greene County ("Juvenile Court") was the only court statutorily authorized to order the release of Victim's confidential juvenile records and had previously denied his request, and even if the trial court could order the release of Victim's juvenile records, Brown failed to make a plausible showing that Victim's juvenile records contain favorable and material evidence to Brown, Point I fails.

*Additional Facts Relevant to Point I*

On January 25, 2023, Brown filed a notice to depose the Chief Juvenile Officer of the Greene County Juvenile Office ("Juvenile Office") and the subpoena issued to the Juvenile Officer commanded him to bring "all records relating to" two of the State's witnesses. On January 26, 2023, an attorney for the Juvenile Officer filed a motion to quash the subpoena stating that "[o]n or about December 14, 2022, [defense counsel] submitted an application for Confidential Juvenile Records with the Juvenile Court with regard to records concerning [D.H.], requesting access to all records in . . . [D.H's] case" and that "[t]he Juvenile Court [j]udge . . . denied [defense counsel's] request." At the hearing on the motion to quash the subpoena, the

6

trial court agreed that the Juvenile Officer could not release the records that the Juvenile Court ruled they are not allowed to release. The trial court stated, "Let me visit with [the Juvenile Court judge]." On February 6, the trial court issued an order quashing the subpoena. On the very next day, February 7, 2023, the trial court ordered by docket entry: "Juvenile records released under seal to the custody of the State and Defense for limited purposes of trial."

At a pretrial conference on April 4, 2023, defense counsel addressed the issue of Victim's juvenile records. Defense counsel pointed out that he had failed to request Victim's juvenile records earlier when he had requested the records of a juvenile witness and was now attempting to do so. Defense counsel stated:

> [Defense counsel]: Judge, I just have one more. You know, we were in here a couple months ago fighting about Juvenile records, and eventually I got the ones I requested. I went back and was going through them and realized I had failed to ask for Juvenile records of the deceased, actually - - I don't know how I managed to do that but I did - - [Victim]. So I reached back out to Ms. O'Brien, and she sent me an email back indicating that [Victim's] records had been turned over to this Court in camera with the other ones. Now, I don't think that's probably true because I never asked for them; so I don't know why they would. But before I responded to her again, I just wanted to clarify with you that you didn't have them in camera somewhere.
>
> THE COURT: Well, if I do, I don't know where they would be.
>
> [Defense counsel]: Like I said, I didn't request them; so I don't know why they would have been packaged together with the others. I think she may be just mistaken on which witnesses they are. But I wanted, just like I said, to bring that up before I responded to her and tell her I didn't think that you have them –
>
> THE COURT: My clerk is telling me that we do not have them.
>
> [Defense counsel]: Okay. And I didn't think you did. So I will respond to her; and, hopefully, since we've already litigated the issue, we won't have to come back here again.
> Thank you. That's all.

Subsequently, on April 18, 2023, Brown filed Defendant's Motion to Compel Juvenile Records ("Motion to Compel") to release Victim's juvenile records from the Juvenile Office. In

7

the motion, Brown asserted Victim "has an extensive juvenile history including acts of violence" that is relevant and admissible as to the issues of who was the initial aggressor and whether Brown acted in self-defense. The motion alleged the Juvenile Office had denied his request for Victim's records; that without said records defense counsel asserted he was "unable to prepare for trial or provide effective assistance of counsel" resulting in Brown being denied his constitutional rights to due process, a fair trial, and effective assistance of counsel.

On April 25, 2023, Brown filed his Third Motion in Limine, requesting an order of the trial court prohibiting the parties and witnesses from referring to any specific acts of alleged and uncharged bad acts by Brown at trial, including testimony from Juvenile Officers Adam Blasczyk and Danielle Tomasi that Brown disobeyed rules and assaulted staff members while in juvenile custody, and prohibiting the State from using Brown's juvenile records in any capacity. A hearing was held on the motions on April 26, 2023, where defense counsel requested the trial court order disclosure of Victim's juvenile records to the defense or, alternatively, exclude the Juvenile Officers Blasczyk and Tomasi from testifying at trial. Defense counsel stated: "[W]e previously were in here arguing about the release of Juvenile records regarding two of the State's witnesses. And after much wrangling—and I appreciate the Court being involved in that—I finally got those records." Defense counsel continued, "I very wrongfully assumed that, since we had already litigated this issue and they had provided me those other records, that I would get these records [for Victim] as well." Defense counsel stated, "I was very surprised when I got that in response that [the Juvenile Court judge] had denied the question." Defense counsel argued, "The Juvenile Office apparently has no problems communicating with [the State] about things that should be sealed by statute that they keep throwing in my face. . . . But when I ask them for anything, I get told, 'No.'" Defense counsel continued, "So what we have now is the

8

State being allowed to smear [Brown] with things that were in Juvenile Court, but I'm not allowed to do the same with [Victim's] juvenile history, which I know there is one."

Defense counsel was asked by the trial court what was in Victim's records and how such records would be admissible at trial and defense counsel responded he had no idea "what's there" in the records:

> THE COURT: Okay. So let me ask you this: [Victim] was at some point, based on your understanding, involved with the Juvenile Office; is that right?
>
> [Defense counsel]: Yes. I know who represented him in Juvenile Court.
>
> THE COURT: Okay. And was he adjudicated in Juvenile Court?
>
> [Defense counsel]: Beats me. They won't tell me. And that's the problem. I have no idea what they're sitting on over there.
>
> THE COURT: All right. Well, let's say that he was adjudicated and found to have violated the law. How do you see that as becoming admissible?
>
> [Defense counsel]: I don't know yet, Judge, because I don't know what's in there.
>
> THE COURT: Well, I'm just saying the worst case scenario would be – because I'm reading in your motion –
>
> [Defense counsel]: I mean, maybe there's going to be enough there that I would be able to elicit testimony from somebody that he had a reputation for violence.

The trial court granted Brown's Third Motion in Limine in part and denied Brown's Motion to Compel by Order dated April 27, 2023, stating:

> [Brown's] third motion *in limine* is granted in part. The State has advised that the two juvenile officers will only testify concerning an incident during which [Brown] allegedly attempted to establish a false alibi. The two juvenile officers will not be permitted to testify about other bad acts committed by [Brown] while he was in juvenile custody and will not be permitted to provide testimony concerning prior referrals of [Brown] to the juvenile office.
>
> [Brown] also seeks the release of the juvenile records which pertain to [V]ictim. As noted previously, this Court does not have the authority to release those records and

9

does not know if any such records even exist. Rather, that authority is given to the Juvenile [j]udge.

At this point, that Court has not approved the release of records relating to [V]ictim. However, even if those records did exist and were released, this Court cannot envision a scenario wherein they would become admissible at trial. [Brown] may contend that these records could lead to the discovery of additional bad acts of [V]ictim which would establish that he was dangerous and posed a threat to [Brown].

The Court is giving wide latitude to [Brown] to introduce evidence as to his state of mind and his fear of [V]ictim provided that the proper foundation can be laid. The Court is not allowing extrinsic evidence of [V]ictim's alleged propensity for violence or gang membership to be introduced except to the extent that it can be established that [Brown] was aware of [V]ictim's history and the effect that this knowledge had on his mental state at the time in question.

Thus, the Court will not permit the use of these other acts of which [Brown] was unaware to establish that [V]ictim was a dangerous person. In other words, evidence on this issue will only be permitted to establish what [Brown] knew of [V]ictim, when he knew it, and what effect, if any, that knowledge influenced his decision to utilize deadly force. Evidence outside of these parameters is not relevant to the issue at hand.

At trial, defense counsel reiterated that he was unaware of what was in Victim's juvenile records and how the records could be relevant or material to the defense.

[Defense counsel]: . . . I sought records of the deceased, [Victim], to see if there was anything similar, that there's something in there that maybe I would be able to use. I don't know if there would be that or not. I do know he has a record in Juvenile Court.

Brown's Motion for New Trial claimed "[t]he [trial] court erred in not ordering disclosure of juvenile records pertaining to [Victim], or in the alternative, excluding witnesses called by the [S]tate in regards to juvenile matters," citing "[f]undamental fairness" and alleged "the [S]tate was given unfettered access to every juvenile document possible that pertained to [Brown]" and that "[f]rom that, the [S]tate was able to dig up anything that even came close to being incriminating." The motion also claimed "there is a reasonable likelihood that denial of this discovery affected the outcome of the trial."

10

*Standard of Review*

The abuse of discretion standard applies when reviewing claims of denial of meaningful discovery and concerning the relevancy and admissibility of evidence.[] "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."[] "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion."[]

When reviewing a claim that a defendant was denied meaningful discovery, the appellate court will determine whether the trial court abused its discretion in such a way as to result in fundamental unfairness.[] "Fundamental unfairness occurs when the state's failure to disclose results in defendant's genuine surprise and the surprise prevent meaningful efforts to consider and prepare a strategy for addressing the evidence."[] However, a "defendant is not entitled to information on the mere possibility that it might be helpful, but must make 'some plausible showing' how the information would have been material and favorable."[]

*State v. Taylor*, 134 S.W.3d 21, 26 (Mo. banc 2004) (footnotes omitted). This Court will not find an abuse of discretion if reasonable persons can disagree as to whether the trial court acted correctly. *State v. Smith*, 579 S.W.3d 284, 287 (Mo. App. S.D. 2019).

*Analysis*

Section 211.321 protects the confidentiality of juvenile court records. *Mason v. State*, 368 S.W.3d 182, 186 (Mo. App. W.D. 2012). "Documents in juvenile court records 'are confidential absent an order of the judge of the juvenile court.'" *In re Interest of A.C.G.*, 499 S.W.3d 340, 345 (Mo. App. W.D. 2016) (quoting *State ex rel. S.M.H. v. Goldman*, 140 S.W.3d 280, 282 (Mo. App. E.D. 2004)).

Section 211.321[3] provides, in pertinent part, that:

> 1. Records of juvenile court proceedings as well as all information obtained and social records prepared in the discharge of official duty for the court shall not be open to inspection or their contents disclosed, except by order of the court to persons having a legitimate interest therein . . . .

---

[3] All references to section 211.321 are to RSMo Cum. Supp. 2021.

Section 211.321.1. "[T]he court" refers to the Juvenile Court, as supported by the fact that section 211.321.1 concerns "[r]ecords of juvenile court proceedings[,]" as well as the fact that the section is contained within Chapter 211, which is entitled "Juvenile Courts." Section 211.321.1. Additionally, subsection 2 of section 211.321 explicitly provides that "[i]n all proceedings under subdivision (2) of subsection 1 of section 211.031, the records of the juvenile court . . . shall be kept confidential and shall be open to inspection . . . only by order of the judge of the juvenile court." Section 211.321.2(4); *see also* section 211.031.1(3)[4] ("[T]he juvenile court . . . shall have exclusive original jurisdiction in proceedings . . . [i]nvolving . . . any person who is alleged to have violated a state law or municipal ordinance prior to attaining the age of eighteen years . . . .").

> [W]hether or not a party has a legitimate interest in the contents of the records of a juvenile court varies from case to case[,] and the question is one to be decided by the juvenile court in its discretion, being guided by the policy considerations underlying Section 211.321 and other provisions of the juvenile code.

*A.C.G.*, 499 S.W.3d at 345 (quoting *State ex rel. S.M.H. v. Goldman*, 140 S.W.3d at 283). Therefore, section 211.321 protects the confidentiality of juvenile court records and provides the procedure for disclosure. *Id.* at 345-46. As such, the trial court here did not err in denying Brown's Motion to Compel because it was not the Juvenile Court and therefore it lacked the authority to order disclosure of Brown's juvenile records when the Juvenile Court had, in fact, denied their release.

Even if the trial court had the authority to order the Juvenile Office to produce Victim's juvenile records in the absence of the authorization from the Juvenile Court, it did not abuse its discretion in denying Brown's Motion to Compel. Our courts have held that the proper

---

[4] All references to section 211.031 are to RSMo Cum. Supp. 2018, including changes effective January 1, 2021.

procedure for disclosing confidential records without violating due process rights requires an *in camera* review of the records by the trial court.

> In the context of a pre-trial discovery dispute, like the instant case, a trial court is required to balance the State's interest in preserving the confidentiality of record that may contain privileged information . . . with a defendant's right to a fair trial. *See* [*State v.*] *Hawkins*, 328 S.W.3d [799,] 808-09 [(Mo. App. S.D. 2010)]. A defendant's due process rights, as well as his rights to confront witnesses and to present a defense are not, however, absolute. *See, e.g.*, *State ex rel. White v. Gray*, 141 S.W.3d 460, 464 (Mo. App. W.D. 2004). When a defendant seeks potentially privileged information, the proper procedure for protecting confidentiality and the defendant's due process rights is for the trial court to conduct an *in camera* review to determine whether the records are actually privileged and, if so, whether, under the circumstances of the case, the asserted privilege should yield to the defendant's specific need for the evidence. [*State v.*] *Artis*, 215 S.W.3d [327,] 337 [(Mo. App. S.D. 2007)]; *State v. Stewart*, 18 S.W.3d 75, 94 (Mo. App. E.D. 2000).

*State v. Julius*, 453 S.W.3d 288, 296 (Mo. App. E.D. 2014).

A defendant is not entitled to an *in camera* review, however, unless the defendant alleges specific facts showing that the records sought to be disclosed contain information that is both favorable and material to the defense. *Id.* at 296-97. "Evidence is material if there is a reasonable probability that, had it been disclosed to the defense, then the result of the proceeding would have been different." *State v. Durbin*, 633 S.W.3d 882, 890 (Mo. App. S.D. 2021) (quoting *Smith*, 579 S.W.3d at 288). A defendant is not entitled to confidential records, or an *in camera* review of confidential records, on the mere possibility that the records may contain favorable and material information. *Julius*, 453 S.W.3d at 296 (trial court did not abuse discretion in quashing subpoena for medical and psychiatric records when defendant raised only a mere possibility that victim's psychiatric records were relevant and material and made no specific factual allegations indicating that victim's medical records would have been relevant or material); *Durbin*, 633 S.W.3d at 889-90 (defendant's speculative assertions insufficient to demonstrate the trial court abused its discretion in refusing to disclosed victim's records with the

Missouri Department of Social Services); *Taylor*, 134 S.W.3d at 26-27 ("The mere possibility, not supported by fact, that the records from these [psychiatric] facilities might contain evidence concerning [defendant's] competence is insufficient to have rendered the trial court's decision to deny discovery and admission of these records as being an abuse of discretion."); *State ex rel. White v. Gray*, 141 S.W.3d 460, 466-67 (Mo. App. W.D. 2004) (where a court had already determined that confidential records may contain evidence relevant to the defense, then due process requires an *in camera* review of the records); *State v. Seiter*, 949 S.W.2d 218, 221-22 (Mo. App. E.D. 1997) (court held it essential that a defendant set forth a factual predicate to justify an *in camera* review; the defendant failed to identify specifically what the confidential records would have disclosed that would have been relevant or material to the defense).

Here, the trial court did not abuse its discretion in denying Brown's Motion to Compel disclosure of Victim's juvenile records because Brown failed to make a plausible showing through specific factual allegations demonstrating that Victim's juvenile records would disclose relevant, admissible, and material evidence to his theory of self-defense or that Victim was the initial aggressor. Brown's Motion to Compel alleged only that Victim had "an extensive juvenile history including acts of violence[,]" which were allegedly "relevant and admissible at this trial as it goes to the ultimate issues of who was the initial aggressor and whether [Brown] acted in reasonable self[-]defense . . . [.]" But, Missouri law is clear on the issue of self-defense "there can be no doubt of the rule that evidence of the deceased's reputation for turbulence and violence is admissible as relevant to show who was the aggressor and whether a reasonable apprehension of danger existed[,]" however, "such evidence must be proved by general reputation testimony, not specific acts of violence, and defendant must show he knew of such reputation when the issue is reasonable apprehension." *State v. Buckles*, 636 S.W.2d 914, 922

14

(Mo. banc 1982), *abrogated by* **State v. Waller**, 816 S.W.2d 212 (Mo. banc 1991); *see also* **Waller**, 816 S.W.2d at 216 ("Where justification is an issue in a criminal case, the trial court may permit a defendant to introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge . . . ."); **State v. Gonzales**, 153 S.W.3d 311, 313 (Mo. banc 2005) ("[A] defendant is not required to demonstrate his awareness of the victim's reputation to the extent the victim's reputation for violence is offered on the question of who was the initial aggressor."). Thus, Victim's specific acts of violence that may have been contained in Victim's juvenile records would not have been admissible at trial unless Brown was aware of those acts at the time of the incident, which Brown failed to allege he was.

At the pretrial hearing, defense counsel repeatedly informed the trial court that he had no idea what was in Victim's confidential juvenile records, only that the disclosure could possibly help the defense. The trial court asked defense counsel, "[W]as [Victim] adjudicated in Juvenile Court?" and defense counsel replied, "Beats me. . . . I have no idea what they're sitting on over there." The trial court then asked defense counsel how Victim's juvenile records, if they showed he violated the law, to be admissible in the trial. Defense counsel replied, "I don't know yet, Judge, because I don't know what's there." Defense counsel stated, "I mean, maybe there's going to be enough there that I would be able to elicit testimony from somebody that he had a reputation for violence." Defense counsel conceded, "[B]ut I don't know if those records would show that because they will not provide them to me."

Brown sought disclosure of Victim's juvenile records on the possibility that the records might contain information relevant and material to his defense. The possibility that confidential records may contain information favorable, relevant or material to the defense is insufficient to justify disclosure of or an *in camera* review of such records. *Julius*, 453 S.W.3d at 296-97.

15

Moreover, Brown failed to allege specific facts to entitle him to either discovery of Victim's juvenile records or an *in camera* review of the records by the trial court. It was not reasonably probable that the disclosure of any specific acts of violence by Victim that may have been contained in Victim's juvenile records would have changed the outcome of trial because other evidence of Victim's specific acts of violence and reputation were admitted at trial.[5] Even if the trial court could have compelled the disclosure of Victim's juvenile records, Brown failed to make the plausible showing that Victim's juvenile records would contain or lead to admissible evidence. Therefore, the trial court did not abuse its discretion in overruling Brown's Motion to Compel. Point I is denied.

**Point II**

In his second point, Brown claims the trial court abused its discretion in admitting State's Exhibits 146 and 147, video surveillance from Brown's juvenile detention and a note written by Brown while in juvenile detention, because this "uncharged juvenile bad acts evidence was neither logically nor legally relevant."

Because Exhibits 146 and 147 were logically and legally relevant as evidence of Brown's consciousness of guilt, the trial court did not abuse its discretion in admitting the evidence at trial.

---

[5] Testimony was presented that Victim had allegedly burglarized a witness's home and that witness and her family "had to distance themselves" from Victim because he had broken into her home, that witness's house had been shot up, and Victim had threatened her family. Brown testified that witnesses had told him about the burglary and apartment being shot up and Victim threatening witnesses. Brown also testified that Victim had threatened him and that he had heard Victim was involved in another shootout earlier the same evening as the incident at White Oak.

16

*Additional Facts Relevant to Point II*

On April 25, 2023, Brown filed a pretrial Third Motion in Limine seeking to exclude evidence of "any specific acts of alleged and uncharged bad acts by [Brown]" because it would be "irrelevant and highly prejudicial[.]"  Specifically, Brown sought to exclude the testimony of Juvenile Officers Blasczyk and Tomasi, who would testify that "[Brown], while in juvenile custody, disobeyed the rules[.]"  The motion also alleged that "the [S]tate should be prohibited from using any juvenile records related to [Brown] in any capacity as the [J]uvenile [O]ffice patently refuses to disclose records of the alleged [V]ictim to defense counsel" and that "[f]undamental fairness and due process . . . would be violated should the court allow the [S]tate to use evidence that is not equally available to the defense."

On April 26, 2023, the trial court held a hearing on Brown's Motion in Limine.  The State argued it was "not going to ask [the Juvenile Officers] about any acts of violence" and instead stated it intends to introduce the evidence as "guilty conscience evidence."  The State explained to the trial court,

> What [Brown] does in one of [the Juvenile Officers'] presence—and the other one is involved on it following that—is he writes on a letter, "I need you to vouch," and he's writing down essentially what is a fake alibi and trying to claim that he's somewhere else at the time the murder would take place. And then when the Juvenile [O]fficer just says they need to read it, he stuffs it in his mouth and tries to eat it.
> And so I am introducing that as guilty conscience evidence.

The trial court denied Brown's Motion in Limine by Order, dated April 27, 2023, ruling:

> The State has advised that the two [J]uvenile [O]fficers will only testify concerning an incident during which [Brown] allegedly attempted to establish a false alibi. The two [J]uvenile [O]fficers will not be permitted to testify about other bad acts committed by [Brown] while he was in juvenile custody and will not be permitted to provide testimony concerning prior referrals of [Brown] to the juvenile office.

17

At trial, when the State called Juvenile Officer Blasczyk as a witness, defense counsel renewed his pretrial objection stating that "allowing the State to use evidence from the Juvenile Court is just fundamentally unfair [in] that [he] do[es]n't have equal access to records on [sic] Juvenile Court." He continued, "[S]o I think due process is violated by allowing an unlevel playing field like this." Defense counsel also objected to the handwritten note coming into evidence, arguing that it was not relevant. He argued, "That note seems to reference an event wholly unrelated to this case. There is a date on there of the 2nd . . . . Clearly, the 2nd has nothing to do with the shoot-out at [White Oak] that happened on July 30 . . . ." Defense counsel continued, "[S]o any probative value of this letter, I think, is far outweighed by the prejudice, if the State can't even show it's the same event." The State responded, "What the State believes the letter says is '2,' and there's another number, which would be a '9,' and then 't-h.' That is what I believe it is saying—the '29th.' And it says 'until 5 a.m.' This happens on July 30th at 2:00." The State continued,

> And so the probative value of the letter saying . . . him needing to get an alibi until 5 a.m., which would cover the time of the offense—and this is the only thing that he is in custody for at the time. It clearly has probative value. That's exactly what he was trying to do, is trying to set up an alibi.

The trial court stated it was going to allow the evidence, over objection.

At trial, Juvenile Officer Blasczyk testified that on August 12, 2022, he had contact with Brown while Brown was in custody at the juvenile detention facility. He testified he observed Brown writing on a piece of paper in the dayroom, which Brown talked about taking back to his room. Officer Blasczyk requested to see the paper based on the facility's "general policy of reviewing whatever they wrote to make sure it's appropriate to bring back into their room." Brown refused to show the officer his writing and insisted he did not want other people looking at it and that he wanted to keep it personal. Instead of showing Juvenile Officer Blasczyk the

18

note, Brown turned away, "balled [the paper] up[,]" "put [the paper] in his mouth[,]" and walked to his room. Juvenile Officer Blasczyk then viewed the security camera and saw Brown in his room holding a piece of paper. This security camera footage was admitted into evidence as Exhibit 146, over defense counsel's objection, and played for the jury.

Officer Tomasi testified that on August 13, 2022, she attempted to find a piece of paper in Brown's room based on the incident from the previous day. She found a piece of paper in one of Brown's books. The paper had been folded multiple times and was crumpled. The piece of paper was admitted into evidence as Exhibit 147, over defense counsel's objections. Officer Tomasi read the portions of the paper she was able to read in open court:

> There are parts that I can't see based on the folding or what's going on. What I can see is "I need you to . . ." And then I don't know what the next word is. I can see a "v-o," and I don't know. ". . . for me. I was with you on the . . ." And then it looks like a "2," but then there's, again, the crease and I can't see. ". . . drunk drinking . . ." And then I don't know what the next word is. ". . . at the crib. I . . ." There's a crease again. Something I don't know. ". . . until 5 a.m." And then ". . . to go to my girl's . . ." And then I don't know what it's saying after that.

Brown later testified at trial that he wrote the note while in custody on this case. Brown testified he was requesting a friend to provide an alibi on his behalf to Brown's girlfriend regarding a night he spent with another girl, not an alibi for the shootout at White Oak. Brown stated that the note read "I need you to vouch for me I was with you on the 29th drunk drinking Dusse at the crib I ain't come home until 5 a.m. to go to my girl's house." Brown claimed the note was due to him having spent the night of the 29th at another girl's house and that he wanted his friend to tell that to his girlfriend. Brown denied the note had anything to do with the shooting. He claimed he put it in his mouth because he "didn't want nobody to know [his] business."

The State argued during its closing argument, and now argues on appeal, that Exhibits 146 and 147 evidence Brown's attempt to create an alibi for the shooting of Victim. During closing argument, the State argued:

> Now, based on the evidence I just described, it's pretty clear that [Brown] did not act in self-defense, but we haven't gotten to the strongest evidence of that. The strongest evidence are the actions of [Brown] after this incident.
>
> . . . .
>
> While he was in jail, he drafted a letter that pretty clearly was a letter calling for a false alibi. When Juvenile asked to look at that letter, he put it in his mouth and tried to hide it from them.
>
> . . . .
>
> And he eventually gets to his cell, and later they recover this piece of paper.
> [Brown] testified to what that piece of paper says. It says, "I need you to vouch for me I was with you on the 29th drunk drinking Dusse at the crib I didn't leave until 5:00 a.m. to go to my girl's house."
> Clearly, from context, we know what this is. This incident happened at 2:40 on the morning of the 30th. If he was with somebody on the night of the 29th for several hours and stayed there till 5:00 a.m., that would mean that he is there through the time of the murder. He is trying to establish a false alibi. People who act in lawful self-defense don't try to establish false alibis.
> Now, [Brown] wants to claim that this is a letter because he didn't want his girlfriend to find out that he was cheating on her. I just want to note that that's preposterous, with the fact that he is eating the piece of paper. Do we really want to believe that he is going so far to hide this note to his girlfriend that he would put it in his mouth and eat it, essentially?
>
> . . . .
>
> Innocent people don't create false alibis. Innocent people – they don't eat paper.

Brown raised a claim in his Motion for New Trial that the trial court erred in admitting evidence received by the State from the Juvenile Office, including Exhibits 146 and 147.

*Standard of Review*

"The decision to admit or exclude evidence [at trial] is reviewed for an abuse of discretion and will not be reversed absent prejudice." *State v. Salsman*, 686 S.W.3d 376, 383

20

(Mo. App. S.D. 2024). "An abuse of discretion requires a ruling to be against the logic of the circumstances and so unreasonable as to show a lack of careful consideration." *Id.* "Prejudice, for purposes of our review, means "the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (quoting *State v. Morgan*, 674 S.W.3d 497, 502 (Mo. App. W.D. 2023)).

*Analysis*

As a general rule, evidence of a defendants uncharged crimes or bad acts is inadmissible to show a defendant's propensity to commit a crime. *State v. Emery*, 2024 WL 4681521 at *10 (Mo. banc Nov. 5, 2024). "Such evidence is admissible, however, if it has a legitimate tendency to establish directly the defendant's guilt of the charged crime and its probative value outweighs [its] prejudicial effect." *State v. Beal*, 966 S.W.2d 9, 13 (Mo. App. W.D. 1997).

"It has been held without exception in this State that evidence to show that an accused has attempted to fabricate or procure false evidence . . . is always admissible as showing his consciousness of guilt." *State v. Freeman*, 667 S.W.2d 443, 449 (Mo. App. S.D. 1984); *see also State v. Smith*, 770 S.W.2d 469, 473 (Mo. App. W.D. 1989) ("[T]he court may admit evidence of a defendant's efforts to procure false testimony during presentation of the [S]tate's case-in-chief as evidence of the defendant's consciousness of guilt."). "A criminal defendant's attempt to suborn perjury . . . is a species of admission by conduct." *Freeman*, 667 S.W.2d at 449. "Such evidence is admissible as evidence of the defendant's guilt of the principal facts charged . . . ." *Id.*; *see also State v. Hibbert*, 14 S.W.3d 249, 253 (Mo. App. S.D. 2000) ("A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an

21

offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or accused's role therein.").

More specifically, our courts have long held that a letter or note written by a defendant attempting to create a false alibi is admissible in evidence. *State v. Seals*, 515 S.W.2d 481, 484 (Mo. 1974) (holding notes from the defendant asking for false testimony admissible as evidence of guilt; "An attempt to fabricate evidence is receivable as evidence of one's guilt of the main facts charged."); *State v. Christian*, 245 S.W.2d 895, 898 (Mo. 1952) (holding a note requesting a witness to change their testimony is always admissible as showing consciousness of guilt); *State v. Chunn*, 701 S.W.2d 578, 585 (Mo. App. S.D. 1985) (finding a letter requesting a false alibi defense admissible as showing consciousness of guilt); *State v. Freeman*, 667 S.W.2d 443, 449 (Mo. App. S.D. 1984) (holding an attempt to fabricate false testimony is always admissible as evidence of consciousness of guilt "without exception in this State.").

The trial court did not abuse its discretion in admitting Exhibits 146 and 147 as the note and Brown's actions to conceal the note were relevant evidence of Brown's consciousness of guilt. Exhibit 147, Brown's note, reasonably could have been construed as Brown's attempt to establish an alibi during the time of the shooting. Putting the note in his mouth to conceal it, and hiding it in a book in his room, could reasonably have been construed as him concealing this note attempting to establish an alibi, which is further evidence of his consciousness of guilt. The probative value of the evidence outweighed any prejudicial effect it may have had. Point II is denied.

The trial court's judgment is affirmed.

JENNIFER R. GROWCOCK, C.J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCURS

MATTHEW P. HAMNER, J. – CONCURS